J-A07024-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| BILAH AMOS ROSE-CALHOUN | : | |
| | : | |
| Appellant | : | No. 1648 EDA 2022 |

Appeal from the Judgment of Sentence Entered May 31, 2022
In the Court of Common Pleas of Delaware County Criminal Division at
No(s):  CP-23-CR-0002955-2021

BEFORE:  DUBOW, J., McLAUGHLIN, J., and McCAFFERY, J.

MEMORANDUM BY McLAUGHLIN, J.:                **FILED MAY 24, 2023**

Bilah Amos Rose-Calhoun appeals the judgment of sentence entered following his conviction for persons not to possess, use, manufacture, control, sell or transfer firearms.[1] He maintains that the trial court erred in denying his motion to suppress. We affirm.

We glean the following facts from the hearing on the motion to suppress. Sergeant James Derwin McCaughan arrived at 110 West Baltimore Avenue around 11:52 a.m. after a 911 call went out about a Black male with a black tracksuit who had pointed a firearm "and then went into the apartment of 110 West Baltimore, specifically Apartment B." N.T., Motion to Suppress, 11/30/21, at 8, 10. Sergeant McCaughan described the building as follows:

---

[1] 18 Pa.C.S.A. § 6105(a)(1).

So 110 West Baltimore Avenue is an apartment that it's a two-story apartment, but it's a row – so it's a row, so it goes from like 110 all the way down to I believe it's 122, it's a row of apartment buildings. . . There's a first floor and second floor. . . . A and B. So there's a front door that leads you to, like, kind of like a little lobby landing, and then you go up the stairs to Apartment B, and then up the stairs to – I mean, to Apartment A, and then up to B. And then there's stairs that go down to a – like a garage area and a laundry room, so it's a laundry room, and then a garage beyond that.

*Id.* at 10-11.

Sergeant McCaughan testified that after about 10 minutes of knocking and ringing the doorbell, Rose-Calhoun's mother, Venus Calhoun ("Mother"), looked out from the second-floor window and asked what was going on. *Id.* at 9. Sergeant McCaughan and Sergeant Christopher Schiazza explained "that [the police] had received a call for a subject with a gun that went into that building[.]" *Id.* at 9, 11. Mother came to the front door and told officers that no one had entered her apartment, Apartment B. *Id.* at 11. When asked if they could "check" the building "for firearms," Mother and Rose-Calhoun's aunt, Kenya Wilson ("Aunt"), who lived in the first floor of the building and had come to the door, said yes. *Id.* at 11, 12, 13, 27. While speaking with Mother, Sergeant McCaughan saw Rose-Calhoun in the "laundry room area" at the bottom of the steps*. Id.* at 12. Sergeant McCaughan asked what he was doing, and Rose-Calhoun said he had just woken up and was doing laundry. *Id.*

Sergeant McCaughan began his search in the laundry room, searching areas "where someone might hide a gun." *Id.* at 13. He then went to the

garage area and "opened up the lid to the trash can that was in the garage, and I saw a bullet sitting on top." *Id.* At this point, Mother asked if Sergeant McCaughan needed a warrant to search. He responded that he did not since she had given her consent. *Id.* However, believing that Mother might revoke her consent, Sergeant McCaughan decided to get a search warrant and left the premises. *Id.* at 14.

Shortly afterward, Chief Rutherford, the chief of police, spoke with Mother and Aunt and obtained their consent to search the property. *Id.* at 15.[2] Chief Rutherford informed Sergeant McCaughan, who then returned to the residence. Before conducting a second search, Sergeant McCaughan explained Mother and Aunt's rights regarding the search including "that they didn't have to consent, and again, that we were going to get a search warrant if they did not consent." *Id.* at 15,16. Both Mother and Aunt gave their consent to search. *Id.* at 17. Sergeant McCaughan also recorded their consent via a tape recorder. *Id.* at 16.

After receiving consent to search, Sergeant McCaughan returned to the garage and found a firearm in the same trash-can where he had initially found the bullet. *Id.* at 17-18. Sergeant McCaughan also testified that he did not ask Rose-Calhoun for consent because he did not live at the property. *Id.* at 27.

---

[2] Chief Rutherford's first name is not included in the notes of testimony.

Mother testified that she lived at 110 West Baltimore Avenue. *Id.* at 50. She testified that during her initial interaction with Sergeant McCaughan, he explained that "he had got a call . . . that somebody came in and ran in our apartment with a gun[.]" *Id.* at 51. She testified that she invited the police in to look for a person and that when Sergeant McCaughan began looking in the washing machines and boxes, she said, "[Y]ou are searching, you need to go get a search warrant." *Id.* at 52. She testified that Sergeant McCaughan continued to search and when he found the bullet in the trash-can, he said, "[O]h, now I've got to get a search warrant." *Id.* at 54. She also testified that she expected them to search her apartment. *Id.* at 56. Mother conceded that she gave the officers consent to search the second time they arrived but said that she was confused. *Id.* at 59.

Aunt testified that she lived in Apartment A at 110 Baltimore Avenue. *Id.* at 64. She testified that officers told her that "they got a call that a guy and a girl was fighting, and the guy had a gun . . . and ran into the apartment building, and went to Apartment B." *Id.* at 65, 66. She testified that officers asked if she had a lease to the apartment and she stated that she did. *Id.* at 67. She also testified that Sergeant McCaughan asked if he could "look" and she said yes. *Id.* at 67, 68. She testified that when he asked if he could look, she thought it meant that "he was looking for someone." *Id.* at 68. She agreed that when officers arrived the second time, she gave consent to search the property. *Id.* at 70. While Aunt maintained that officers never said that they were searching for a gun, she testified Sergeant McCaughan "said that the call

. . . said that there was a -- the guy had a gun." ***Id.*** Aunt also testified that the laundry area is a shared area for both apartments. ***Id.*** at 66.

The trial court denied the motion to suppress and concluded Rose-Calhoun "failed to prove the consent given in this case by his mother and his aunt" was not voluntary. Order Denying Defendant's Motion to Suppress, filed 1/31/22, at 7. It determined that Mother and Aunt both testified that they initially gave Sergeant McCaughan consent to search the residence and Sergeant McCaughan stopped searching and left the premises when they questioned the scope of his search. ***Id.*** The court also determined that Mother and Aunt gave consent again when officers returned. ***Id.***

Rose-Calhoun proceeded by way of a stipulated bench trial and the court found him guilty of the above-referenced offense. The court sentenced him to 72 to 144 months' incarceration followed by one year of reporting probation. Rose-Calhoun filed a post-sentence motion, which the trial court denied. This timely appeal followed.

Rose-Calhoun raises the following issue: "Whether the court below erred in denying [Rose-Calhoun's] motion to suppress evidence, where police conducted a warrantless residential search without valid and complete consent or any other applicable exception to the warrant requirement, in violation of Pa. Const. Art. 1, § 8 and U.S. Const. Amend. IV, XIV?" Rose-Calhoun's Br. at 4.

When reviewing the denial of a motion to suppress, we determine "whether the record supports the suppression court's factual findings and the

- 5 -

legitimacy of the inferences and legal conclusions drawn from those findings." ***Commonwealth v. Griffin***, 24 A.3d 1037, 1041 (Pa.Super. 2011) (quoting ***Commonwealth v. Lohr***, 715 A.2d 459, 461 (Pa.Super. 1998)). Where the Commonwealth prevailed on the motion, "we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted." ***Commonwealth v. McMahon***, 280 A.3d 1069, 1071 (Pa.Super. 2022) (citation omitted). "Our scope of review of suppression rulings includes only the suppression hearing record and excludes evidence elicited at trial." ***Id.*** (citation omitted). Where the factual findings of the court are supported by the record, we will only reverse the decision of the court if there is an error in the legal conclusions drawn from those factual findings. ***See id.***

Rose-Calhoun claims the court erred in denying his motion to suppress. He argues that the officers "lacked unequivocal and specific authority to search for a firearm within the home absent a warrant." Rose-Calhoun's Br. at 17. He maintains his mother gave general consent but only expected police to search for a person. ***See id.*** at 16. Thus, he argues that she did not give officers consent to search her personal belongings. He claims that even if Mother gave consent to search her personal belongings, she revoked her consent when she confronted the police about obtaining a warrant. ***See id.*** at 17. He maintains that officers failed to stop their search after the revocation of consent and instead continued to search the home which led the police to find the bullet in the trash-can. ***See id.***

The Fourth Amendment of the United States Constitution and Article 1, Section 8 of the Pennsylvania Constitution both protect against unreasonable searches and seizures, and bar warrantless searches of residences unless an exception applies. *See Commonwealth v. Luczki*, 212 A.3d 530, 542, 546 (Pa.Super. 2019). "Warrantless entry and search of a house is constitutionally permissible where an occupant with authority over the premises consents to the entry and search." *Commonwealth v. Lehnerd*, 273 A.3d 586, 590 (Pa.Super. 2022). "To be considered valid, the consent must be the product of an essentially free and unrestrained choice—not the result of duress or coercion, express or implied, or a will overbourne—under the totality of the circumstances." *Commonwealth v. Carmenates*, 266 A.3d 1117, 1124 (Pa.Super. 2021) (*en banc*) (citation omitted). When determining the scope of consent, a court must consider what "a reasonable person would have understood by the exchange between the officer and the person who gave the consent." *Commonwealth v. Fredrick*, 230 A.3d 1263, 1267 (Pa.Super. 2020) (citation omitted). A person who gives consent may limit the scope of the consent or revoke it entirely. *See Commonwealth v. Gallagher*, 263 A.3d 1207, 1212 (Pa.Super. 2021); *Commonwealth v. Valdivia*, 195 A.3d 855, 868 (Pa. 2018).

Rose-Calhoun's arguments are meritless. Mother permissibly consented to Sergeant McCaughan's searching a common area for a firearm, and he did not exceed the scope of that consent or fail to stop searching after she revoked her consent. Sergeant McCaughan arrived at the location in response to a 911

call. After arriving on location, he encountered Mother, a resident of the building, who allowed him entry into the building. Sergeant McCaughan explained why he was at the location and received consent from Mother to search the premises. Though Rose-Calhoun argues that Mother believed that police were searching for a person, we must consider what a reasonable person would have understood from the exchange with Sergeant McCaughan. *See Fredrick*, 230 A.3d at 1267. Sergeant McCaughan asked if he could "check" for firearms, and a reasonable person would have understood that their consent included a search in places where someone could hide a firearm. Additionally, while Rose-Calhoun claims that Mother revoked her consent before the initial search of the trash can, this claim is based on Mother's testimony. Considering "only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted[,]" Sergeant McCaughan testified that it was *after* he found the bullet in the trash-can that Mother inquired whether he needed a warrant and that he stopped his search. *See McMahon*, 280 A.3d at 1071.

Furthermore, even if there was something amiss with the first search, both Mother and Aunt gave consent a second time, which resulted in the search during which Sergeant McCaughan found the firearm in the trash-can. The discovery of the gun was not the fruit of the allegedly poisonous first search, but rather of the second search, undisputedly performed with consent. The trial court committed no error by denying the motion to suppress.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/24/2023